ERVIN, Judge.
Ashland brought an action for damages against the Road Department on a roadway construction contract. The contract involved a public works'project calling for both the construction of a highway and the installation of an improved storm sewer system along 1.81 miles of roadway on Cas-sett Avenue, a street located in Jacksonville, Florida. The case was tried non-jury. At the conclusion of the trial on October 6, 1975, the court ruled that corrections were to be made in the Department’s computation of certain items. It held that the principal amount due appellant was $42,235.04, and that interest was to be computed from March 1, 1969 until the date of the verdict, October 6, 1975. Ashland was directed to draft the proposed final judgment. It did not submit the draft until January 22, 1976 and on February 20,1976, the court entered judgment for appellant in the principal sum of $42,235.04, together with interest, from March 1, 1969.
Ashland appeals assigning two errors: (1) That it is entitled to recover $2.00 per'cubic yard for the removal of certain material excavated from a pipe trench it was required to remove from the right of way job-site, and $2.50 per cubic yard for an equal volume of suitable backfill material it was required to replace in the. pipe trench. (2) That since Ashland’s uncontradicted evidence showed it was necessary for it to excavate a pipe trench with sides having an average 45 degree slope,- the trial court erred in allowing compensation to it only for the volume of material removed by assuming that such trench excavation had only vertical sides. The Department cross-appeals alleging that the trial court erred in allowing interest oil the principal sum to be computed from March 1, 1969 through January 22, 1976, which latter date was the date Ashland submitted the proposed, final judgment to the court. The Department contends that the court should not have directed the accumulation of interest beyond the date of the verdict, October 6, 1975.
The primary problem arose when the Department’s engineer determined that material excavated from the pipe trench was unsuitable and directed Ashland, to remove it from the job-site and . replace it with suitable material. No actual meásurements were made on the ground'of the excavated material. Ashland introduced evidence that it requested the engineer to make such measurements but he failed to do so! The evidence is undisputed that the sides of the trench sloped outward from the base Up to ground level. In the absence of actual measurements Ashland contends that the best estimate' of the volume of such unsuitable backfill material shodld be based upon an- estimate testified' to by its engineer which assumed that the actual volume of unsuitable backfill'material removed'from the site of the pipe trench excavation was equal to the volume of the excavation between the various construction stations where the Department’s engineer recorded that unsuitable backfill material was found during the progress of the excavation of the trench. The width of the excavation at the bottom of the trench was the outer diameter of the pipe plus two feet (one foot on each side of the outer edge of the pipe). The volume was then calculated by the average end area times the length of the cut with both sides sloping upward at a 45 degree angle. Ashland’s engineer testified that when measured in this fashion' the volume of unsuitable backfill material át *880 the site of the pipe trench excavation removed by plaintiff was 27,561 cubic yards.
In calculating the amount of material excavated from the pipe trench, the Department used the same bottom width measurement as Ashland did, being the outside diameter of the pipe plus one foot on each side. The Department, contrary to the actual facts, assumed that the pipe trench excavation had vertical sides. This assumption was based upon Section 130.11 of the contract specifications which provides:
“When direct payment for Excavation for Structures is provided in the Proposal, such excavation will be measured in its original position by the cross-section method to determine the amount of material removed. The yardage of excavation used as a basis of payment will then be that material actually removed below the original ground line or stream bed, but not including that shown on the Plans to be paid for either as Regular Excavation, Subsoil Excavation or Lateral Ditch Excavation, or which is included in the item for Grading, and except that no payment will be made for material removed in excavating for footings or foundations outside of an area which is bounded by vertical planes one foot outside of the limits of the footings and parallel thereto. For pipe trenches the width to be used in the calculation shall be the diameter of the pipe plus two feet.” (Emphasis added.)
The Department therefore contends that it was not necessary for it to make any actual measurements of unsuitable backfill material or suitable backfill material. Appel-lee’s reasoning, however, is erroneous because Section 130.11 has no application to the contract between the two parties. The section applies only to contracts involving direct payment for excavation for structures. It is clear from the record that there was no direct payment for the excavation of the pipe trench. The lower court itself so conceded when it stated:
“There was no provision in the contract for direct payment for excavation of the pipe trench. This work was included under § 360 of the specifications which is entitled, ‘Pipe, Culverts and Storm Sewers.’ ”
While the court recognized that Section 130-11 “does not dictate the method for measuring the quantity of unsuitable back-fill material . . . that [Ashland] was required to remove . . ' . ”, nevertheless the court tacitly approved the formula set forth in the section by holding it would assume the pipe trench had vertical sides, with a width of the outer diameter of the pipe plus two feet, without deducting the volume of pipe, in determining the volume of cubic yards excavated from the pipe trench, or a total of 11,224 yards.
The fallacy with the court’s conclusion is that its determination was inconsistent with the facts since the record is clear that the pipe trench did not have vertical, but sloping sides. The Department failed, although requested by Ashland, to measure on the ground the amount of material excavated from the trench. The only evidence before us, and uncontradicted by the Department, was the opinion testimony of appellant’s engineer that the width of excavation at the bottom of the trench was the outer diameter of the pipe plus two feet with the trench slopes going upward to ground level at a 45 degree angle. Based upon such estimate, the volume of material removed from the trench was 27,561 cubic yards. The trial court allowed only 11,224 cubic yards. Ashland must be-compensated for the difference.
Ashland also urges that it is entitled to recover the unit price of $2.00 per cubic yard for removal of the excavated material from the trench. We find that the lower court was correct in allowing Ashland $2.50 per cubic yard for both the removal and replacement of the unsuitable pipe trench material. The contract provided that Ash-land would be compensated at the unit price of $2.00 per cubic yard for subsoil excavation. It was also to be compensated for backfill of excess subsoil excavation at the rate of 125 per cent of the contract unit price, or $2.50 per cubic yard. Section 130-12.2 of the contract specifications provides *881 that when no direct payment is provided, payment shall be made at the contract unit price. Section 360-12.6 generally provides that “above prices . . . shall be full compensation for all the work specified in this section. . . . Such prices . shall also include all backfill, disposal of surplus material. . . . ”
Section -130-8.1 states that “when the available material at the site of the excavation is not considered suitable for the back-fill, the work of removing any of such material which might be Surplus at the particular location'and of bringing in material suitable for the backfill will be compensated for as provided in 9-3.4.”’ That section provides:
“9-3.4 Subsoil Excavation:
9-3.4.1 Contingent Nature of Limits shown on Plans: The limits of Subsoil Excavation, as might be indicated on the Plans are to be considered as being particularly subject to field variations, in accordance with the conditions actually encountered.
9-3.4.2 Payment for Backfilling of Excess Subsoil Excavation (Applicable where payment for the Grading work is at a Lump Sum of Road-Mile price): In addition to the payment for the Subsoil Excavation at the contract unit price (for the quantity actually ordered by the Engineer), in the event that sufficient suitable material for backfilling any subsoil excavation in excess of the quantity indicated on the original plans is not available from the roadway grading operations required by the original plans, such excess material shall be compensated for by the adjustment in the contract price for the grading, (as specified in 9-3.3), except for certain cases when the excess material is obtained from outside the roadway right of way as follows:
(1) When payment for the borrow material is specified to be made as a separate item: In this case, any such excess material not obtained from within the roadway right of way, will be measured and paid for as Borrow Excavation.
(2) When no pay item covering the borrow material is contained in the Contract (either as a separate item or included in the grading item): In this, case, for the quantity of such excess backfill material obtained outside the roadway right of way, compensation will be made as follows: A Quantity of backfill material equal to the volume of Subsoil Excavation in excess of the original plan quantity (excluding any portions which might be replaced by material from within the roadway right of way) shall be paid for under the contingent item of ‘Backfill of Excess Subsoil Excavation.’ Such quantity will. be paid fpr at the established rate of 125 per cent of the contract price for Subsoil Excavation.”
Subsection two of the above section clearly provides that the quantity of backfill material equal to the volume of subsoil excavation in excess of the original planned quantity “will be paid for at the established rate of 125 per cent of the contract price for subsoil excavation.” Ashland, however, contends this language should be read in conjunction with the sentence in 9-3.4.2, “In addition to the payment for the subsoil excavation at the contract unit price. . ” This is the basis for Ashland seeking $2.00 per cubic yard (the contract unit price), plus $2.50 for the backfill material.
Section 9-3.4.2 by its terms provides for the backfill in excess subsoil excavation. That section is only applicable to our situation because of the wording of Section 130-8.1. It is clear that in the casé of excess subsoil excavation, Ashland would be paid $2.00 for the excavation of subsoil and $2.50 for backfill when suitable material must be hauled in. However, in this situation Ashland has already been compensated for subsoil excavation at the rate of $2.00 per cubic yard and for excavation of the pipe trench under Section 360 of the specifications. To pay Ashland an additional $2.00 per cubic yard for removal of the unsuitable material from the job-site would allow payment for something that simply does not appear in the contract. Indeed, *882 Section 360-12.6, quoted above, clearly puts the duty of disposal on the contractor. Further, Section 130-8.1 orders compensation for both the removal of unsuitable materials and the bringing in of suitable materials under subarticle 9-3.4. The pertinent provisions of the contract are sufficiently clear and unambiguous to conclude that Ashland is entitled to be paid at the rate of 125 per cent of the contract unit price, or $2.50 per cubic yard for both removal and replacement of unsuitable back-fill material from the trench site. In the absence of any ambiguities, a reasonable interpretation of the contract language must control. Florida State Turnpike Authority v. Industrial Construction Company, 133 So.2d 115 (Fla. 2nd DCA 1961); 7-Fla. Jur. Contracts Sec. 74, p. 137.
This cause is remanded to the trial court with directions that the final judgment dated February 20, 1976, and amended by order dated February 23,1976, be modified as follows: That in addition to the sum of $42,235.04 previously awarded Ashland, Ashland shall recover from the Department $40,842.50, which is computed as follows: 27,561 cubic yards for removal and replacement of unsuitable backfill material minus 11,224 cubic yards formerly allowed in the final judgment, or the difference of 16,337 cubic yards X $2.50 (125 per cent of the contract unit price).
Interest shall run on the principal amount from March 1, 1969, at six percent interest. In all other respects the judgment is affirmed.
RAWLS, Acting C. J., and McCORD, J., concur.